# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH FELICE AND PATRICIA SCLAFANI, <br><br> Plaintiffs, <br><br> vs. <br><br> THE CITY OF NEW YORK, POLICE OFFICER BRENDAN CRONIN, SGT. EDWIN CHING, POLICE OFFICER RYAN BRACCONERI, POLICE OFFICER WILLIAM CONCANNON, POLICE OFFICER JEFFREY GRIFFIN, LT. KEVIN BROWN, SGT. JOSEPH SIMONETTI and AHCI, Corp. a/k/a or d/b/a ALEHOUSE, <br><br> Defendants. | Civil Action No. 15-CV-5842 <br><br><br> **AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

By and through their attorneys, Randolph M. McLaughlin, Debra S. Cohen, Howard B. Stolzenberg, and Terrence J. Cortelli, Plaintiffs Joseph Felice and Patricia Sclafani allege upon knowledge, information, and/or belief as follows:

## PRELIMINARY STATEMENT

1.    This is a civil rights action in which Plaintiffs Joseph Felice ("Joseph Felice" or "Mr. Felice" or "Joe") and Patricia Sclafani ("Patricia Sclafani" or "Patricia") seek relief for the Defendants' violation of the Plaintiffs' rights, privileges, and immunities secured by 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments of the United States Constitution, and the Constitution and laws of the State of New York.

2.    It is alleged that the Defendants, acting jointly and severally, committed a series of unlawful acts that culminated in New York City Police Officer Brendan Cronin ("Brendan Cronin" or "Officer Cronin") shooting, and nearly killing, Joseph Felice, an innocent man on his way home after playing in a recreational league hockey game, and also tragically impacting his

family.

3.     The unprovoked terrorizing shooting of Mr. Felice by Officer Cronin has caused devastating physical, emotional and psychological injuries and economic loss to Mr. Felice and deprived him of rights secured by the United States Constitution, federal law, and the Constitution and laws of the State of New York.

4.     Defendant Officer Cronin's actions also inflicted significant and ongoing physical, psychological, emotional and economic harm on his wife, Patricia Sclafani.

5.     It is further alleged that the failure of the Defendant City of New York ("City") and the New York City Police Department ("NYPD") to adopt and/or enforce adequate policies, procedures, and practices to address a longstanding problem of alcohol and substance abuse by its police officers, while both on-duty and off-duty, constituted deliberate indifference and was a proximate cause of Plaintiffs' injuries.

6.     The City's and NYPD's deliberate indifference to adequately respond to alcohol and substance abuse by its police officers includes a failure to adopt and/or enforce policies, procedures and practices addressing the use and misuse of police issued service weapons by officers both on-duty and off-duty who are not fit for duty because of said abuse while in possession of their firearms.

7.     It is also alleged that the NYPD's training facility, Rodman's Neck, failed to adopt and/or enforce adequate policies, procedures and practices to detect, monitor and control substance and alcohol abuse by NYPD personnel during and after their participation in training exercises.

8.     It is further alleged that Rodman's Neck failed to adopt and/or enforce adequate polices, procedures and practices to screen officers' physical and psychological condition at the

2

conclusion of their participation in training exercises to determine if they were fit for duty and to possess their service weapons.

9.     Defendants Brown and Simonetti knew, or should have known, that Officer Cronin, Sgt. Edwin Ching ("Sgt. Ching"), and Police Officers Ryan Bracconeri, William Concannon and Jeffrey Griffin ("Officers Bracconeri, Concannon and Griffin") consumed alcohol on their lunch break, while on-duty, and in the midst of undergoing stressful and mentally-challenging training exercises under their supervision at the NYPD's Rodman's Neck training facility.

10.     Said Defendants released Officer Cronin, Sgt. Ching, Officer Bracconeri, Officer Concannon and Officer Griffin from the training facility knowing they had consumed alcohol earlier in the day and without adequately determining if they were physically or mentally fit for duty, to drive a car or resume control of their service weapons.

11.     Sgt. Ching, Officer Cronin's supervisor, and Officers Bracconeri, Concannon and Griffin, directly participated in and facilitated the abusive consumption of alcohol by Officer Cronin while and after undergoing training exercises in dynamic vehicle takedowns at Rodman's Neck on April 29, 2014.

12.     Sgt. Ching and Officer Bracconeri facilitated Cronin's alleged inebriation and then took no actions to prevent him from driving his vehicle while intoxicated.

13.     Said Defendants knew or should have known that Cronin was unfit to drive and to do so in his condition was a violation of the law.

14.     Said Defendants and Officer Cronin, excessively consumed alcohol together while all were in possession of their police issued service weapons.

15.     Said Defendants knew or should have known that they had a duty to stop Officer

Cronin from operating a vehicle and/or be in possession of his service weapon, while intoxicated and that choosing not to prevent him from doing so would create or increase the danger of injury to innocent people he would encounter in that condition, including Plaintiffs.

16.    It is further alleged that the Defendant AHCI, Corp. a/k/a or d/b/a Alehouse ("Alehouse") violated the New York Dram Shop Act, N.Y. General Obligations Law §11-101, and The Alcoholic Beverage Control Law §65(2), by serving, unlawfully selling, and assisting in procuring liquor to Officer Cronin, Sgt. Ching, and Officers Bracconeri, Concannon, and Griffin, thereby causing and/or contributing to Officer Cronin's intoxication and the resultant actions that caused devastating physical and psychological injuries and economic harm to the Plaintiffs and their family.

17.    As a remedy for these violations alleged therein, Plaintiffs seek compensatory damages, punitive damages and an award of the costs and expenses of this action including attorneys' fees to the Plaintiffs pursuant to 42 U.S.C. §1988; and any such other and further relief as this Court may deem appropriate.

## JURISDICTION AND VENUE

18.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 and §1343. Plaintiffs further invoke the supplemental jurisdiction of this Court under 28 U.S.C. §1367 to hear and decide claims arising under state law.

19.    Venue in the Southern District of New York is proper under 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to this action occurred within the district.

## TRIAL BY JURY

20.    Plaintiffs demand trial by jury on each and every one of their claims herein.

## PARTIES

21.     At all times relevant, Plaintiffs Joseph Felice and Patricia Sclafani were residents of Westchester County, New York.

22.     Defendant City is a duly constituted municipal corporation of the State of New York. It is authorized under the laws of the State of New York to maintain a police department, the NYPD, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

23.     Defendant Officer Cronin was at all times relevant herein a police officer employed by the City and the NYPD and was a resident of Westchester County. At all times relevant to the facts of the Complaint, said Defendant was acting under color of law and within the scope of his employment. Said Defendant is sued in his individual and official capacity.

24.     Defendant Sgt. Ching was at all times relevant herein an employee of NYPD responsible for supervising police officers under his command. At all times relevant to the facts of the Complaint, said Defendant was acting under color of law and within the scope of his employment by the City. Said Defendant is sued in his individual and official capacity.

25.     Defendant Officers Bracconeri, Concannon and Griffin were at all times relevant herein, employees of the NYPD. They were police officers who were undergoing training with Officer Cronin and consumed alcohol with him and Sgt. Ching.

26.     Defendants Lt. Brown and Sgt. Simonetti were supervisors of the training received by Officer Cronin on April 29, 2014, and both observed and interacted with him during and upon completion of the training.

27.     Defendant Alehouse is and was at all times relevant herein a restaurant and/ or bar

establishment, incorporated in the State of New York as AHCI, Corp., operating with an active liquor license, and located at 288 City Island Ave, Bronx, NY 10464.

28.    The conduct and injuries complained herein were inflicted on the Plaintiffs by the Defendants without any negligent or culpable conduct by the Plaintiffs.

## FACTUAL ALLEGATIONS

29.    On April 29, 2014, Plaintiff Joseph Felice (then forty-seven years old) and his good friend, Robert Borrelli ("Mr. Borrelli" or "Rob"), played in a hockey game as part of a recreational league they had participated in for many years.

30.    When the game was over, the two men got into Mr. Borrelli's car to drive home.

31.    Rob exited the Hutchinson River Parkway at the Lincoln Avenue exit in Pelham, New York heading eastbound towards Joseph Felice's New Rochelle home.

32.    On that night, like so many other nights following a hockey game, Rob expected to deliver his friend healthy and whole to his family.

33.    During the drive, Joe exchanged text messages with his wife – Joe letting her know he would be home soon.

34.    Not long after Joe and Patricia texted each other, Rob brought the car to a stop at a yellow traffic light at the corner of Lincoln and 6th Avenue.

35.    Neither Joe nor Rob could have possibly imagined the horror about to be visited upon them by New York City Police Officer Brendan Cronin.

### Cronin's Actions Leading Up the Shooting

36.    On April 29, 2014, Officer Cronin spent his shift completing the second day of stressful and rigorous training in dynamic vehicle takedowns at the NYPD's Rodman's Neck training facility.

37.    Defendants Lt. Brown and Sgt. Simonetti supervised the training and directly observed and interacted with Officer Cronin during and after completion of the training.

38.    Upon arrival at Rodman's Neck, police officers are required to store their service weapons and are provided specially designed non-lethal weapons to use during the training exercise.

39.    During the training, while on-duty, Officer Cronin, along with his supervisor, Sgt. Ching, and Officers Bracconeri, Concannon and Griffin, went to nearby City Island to eat lunch and drink alcohol before returning to continue their training under Lt. Brown's and Sgt. Simonetti's supervision.

40.    Later in the afternoon, Cronin and his colleagues were released from training by Defendants Brown and Simonetti.

41.    Upon departing the training facility, Officer Cronin, Sgt. Ching and Officer Bracconeri returned to City Island where they patronized Alehouse to watch a hockey game and consume, by Cronin's own admission, at least ten drinks consisting of Jameson whiskey shots and beer.

42.    Sgt. Ching and Officer Bracconeri were present, participated in, and encouraged, Officer Cronin's heavy drinking that night.

43.    Sgt. Ching and Officer Bracconeri bid Officer Cronin farewell as they left Alehouse knowing that he was getting into his vehicle, ostensibly to drive home to Yonkers, while intoxicated and in possession of his NYPD issued service weapon.

44.    Instead of driving directly home, Brendan Cronin exited the highway and stopped his car in the parking lane of E. Lincoln Avenue in Pelham, New York and put on his hazard lights.

45.     A security video from a car wash across the street from where Brendan Cronin parked then shows him getting out of his car and walking into an adjacent yard. The video also captured the chilling events that followed that have changed the lives of Joseph Felice, Patricia Sclafani and their family forever.

**The Shooting**

46.     When Rob stopped his car at the yellow light, Brendan Cronin can be seen on the car wash video, stepping out of the shadows, walking purposefully to the driver's side rear door of his parked car, opening the door, reaching inside, retrieving his service weapon and, in a bladed stance, repeatedly firing from the rear of Mr. Borrelli's car.

47.     Investigators determined that Officer Cronin, still wearing his NYPD shirt stained with powder from the training exercise he underwent earlier that day at Rodman's Neck, fired at close range his NYPD issued 9-mm Glock directly at the two innocent and unsuspecting men as they sat chatting in Rob Borrelli's stopped car, emptying his ammunition clip.

48.     When Officer Cronin began firing by the right rear bumper, Joe felt an immediate intense burning sensation in his right arm and began screaming from pain and fear as further gun shots repeatedly struck his body.

49.     Joe knew immediately that he had been shot but could not comprehend why or from where the bullets were being fired. Joe's first thought was that perhaps he and Rob were the random targets of some sort of gang initiation.

50.     The bullets moved purposefully from right to left, first striking Joe, who was sitting in the front right passenger seat, and then moving methodically to the left toward the driver's side.

51.     The impact of the first bullets caused Joe to slump down and over to the side.

52.     Rob Borrelli, the driver, then attempted to seek cover as best he could under the dashboard in an effort to shield himself from what felt like an interminable attack.

53.     Images of Rob's car, shown in news accounts, memorialize the fusillade of bullets let loose by Brendan Cronin. However, what these images do not show is the bullet holes that went through the headrest where Joe's head had been just seconds before.

54.     Ironically, it was the momentum of the bullets hitting Joe's shoulder that pushed him downwards and to the left, onto the car armrest by the gear shift. This likely saved him from sustaining a fatal bullet wound to the head or a paralyzing shot to his spine.

55.     Nor do the images show how Joe's hockey equipment, which he had placed in the passenger seat directly behind him, partially absorbed the force of some of the bullets. A bullet hole, almost perfectly centered, can be seen having pierced straight through Joe's hockey stick. Bullet holes covered the width of the windshield and riddled the dashboard.

56.     Officer Cronin had emptied his entire clip into the inside of the car occupied by Rob and Joe. Six of those bullets hit Joe, not including the bullet fragment that lodged in his head.

57.     Rob could hear Joe screaming as bullets repeatedly struck his friend. The screams continued while Rob was helpless to move as the barrage of bullets struck the dashboard and windshield just above his head.

### After the Shooting Stops

58.     As soon as the shooting stopped, Rob knew he had to get his friend to a hospital. He sat up and immediately sped off, not knowing if the shooting would soon begin again or if the shooter would follow them.

59.     In those first few seconds after the shooting stopped, Rob realized he had to act

fast because his friend Joe was alternating between consciousness and unresponsiveness, and was clearly gravely injured. Rob realized that Montefiore Medical Center in New Rochelle was somewhere nearby and rushed to get Joe there.

60.     It was too dark in the car for Rob to see where Joe had been hit. Joe's dark hooded sweatshirt made it difficult to see the amount of blood he was losing. As he made his way towards the hospital, Rob heard bubbling and gurgling sounds coming from Joe, who had now become completely unresponsive.

61.     Once at the hospital, hospital workers and a police officer helped remove Joe from the car. Rob heard Joe screaming in pain as he was being extricated from the car. Rob remembers feeling relief because Joe's screams meant he was still alive.

62.     After Joe was taken inside the hospital, Rob went back to the car to retrieve Joe's phone and wallet. It was then he saw for the first time the pool of his friend's blood covering the floor mat on the front passenger side. As emergency room doctors started working to save Joe's life, Rob called his wife Margaret, Joe's wife Patricia and Joe's brother.

**The Fight to Save Joe Felice's Life**

63.     When Patricia Sclafani, Joe's wife, received the call from Rob she at first found it hard to comprehend what he was telling her. She forced herself to push her worst fears from her mind so that she could do what was necessary to get to her husband's side.

64.     She raced to the hospital which, thankfully, was only a few minutes away.

65.     When Patricia arrived at the hospital, one of the first things she saw was Rob's bullet riddled car  Seeing the location and number of bullet holes sprayed across the front windshield, including exactly where she knew her husband had been sitting, almost caused her to pass out because in that moment it was hard for her to believe he could still be alive.

66.    However, Patricia had to fight to stay focused for the welfare of her husband and family and get to Joe immediately.

67.    Every second it took Patricia to get to Joe seemed interminable. Each step toward the hospital felt like an almost insurmountable obstacle until, finally, Patricia made it into the emergency room.

68.    Although when Patricia arrived at the emergency room, she was told that Joe's condition was life threatening, nothing they could have said would have prepared her for what she was about to see.

69.    When she walked into the treatment room where multiple doctors and nurses were working to save her husband's life, it looked like a war zone. His blood was everywhere. Bloody sheets, bloody gauze pads and blood splattered all over the clothes and facemasks of the doctors and nurses.

70.    Patricia went to Joe and positioned herself behind his head so that she could speak to him without interfering with the emergency room team's efforts. She told him that he had to live for the sake of their family. She said anything and everything she could think of to give Joe the strength and will to survive.

71.    To this day, Patricia is haunted by what she saw when she looked in her husband's eyes. His eyes were open but lifeless. He appeared to look right through her – as if he were already dead.

72.    During this time, Joe went in and out of consciousness. Because his blood pressure was dangerously low, the doctors could not give him pain medication. As a result, he felt everything that was happening to him. He felt the pain of his gunshot wounds, he felt the pain of the chest tube being inserted into his lung, and he felt the excruciating pain of the

catheter being inserted into his penis.

**Officer Brendan Cronin's Actions Immediately After the Shooting**

73.    The car wash surveillance video shows that after the shooting, Officer Cronin appeared unsure about what he wanted to do next. After standing in the street for a few seconds, seemingly watching Mr. Borrelli's car drive away, Officer Cronin got into his car and slowly drove away with his hazard lights still flashing.

74.    Neighborhood residents, having heard what they believed to be shots being fired, had called the police. Within minutes of Officer Cronin driving away, the video shows a police car passing the shooting location. The police car catches up to Officer Cronin's vehicle as it enters New Rochelle, about a quarter of a mile from the shooting.

75.    As other police cars arrive, initially Officer Cronin brandished his NYPD issued 9-mm Glock out the car window and ignored repeated orders from local police to drop the weapon. It was only after he was told that he would be shot if he didn't drop the gun that Officer Cronin dropped the weapon out the car window, gave himself up and was taken into custody.

76.    Once in custody, Officer Cronin refused to take a breathalyzer test. Although his refusal was telling, no test was necessary to discern the strong alcohol odor that he emanated.

77.    While in custody that night, Officer Cronin denied having any recollection of being in Pelham or of the shooting.

78.    Shortly after Officer Cronin was taken into custody by local police in Pelham, his representatives from the NYPD PBA arrived and met with him in his jail cell.

79.    Several NYPD police personnel, including high ranking officials, came to both Pelham and New Rochelle to gather information from local authorities as to what had occurred.

80.    Within a few hours of the shooting, NYPD investigators began retracing Officer

Cronin's steps prior to the shooting, including determining where and with whom he had been drinking after leaving Rodman's Neck.

81.     They then visited Alehouse to question staff regarding what they remembered about the actions of Officer Cronin, Sgt. Ching and Officers Bracconeri, Concannon and Griffin. Oddly, when questioned again later, Alehouse staffers initially admitted then denied that Officer Cronin, Sgt. Ching and Officers Bracconeri, Concannon and Griffin had been drinking there..

82.     When Officer Cronin was initially arrested he was charged only with assault. Later, a grand jury issued indictments against him as follows (see County of Westchester Indictment No. 14-0584): One (1) count of attempted murder in the 2nd degree (NEW YORK PENAL LAW §§ 110, 215) and  one (1) count of assault in the 1st degree (NEW YORK PENAL LAW §§ 120.10[01]) and one (1) count of assault in the 1st degree (NEW YORK PENAL LAW §§ 120.10[03]) for Mr. Felice; And one (1) count of attempted murder in the 2nd degree (NEW YORK PENAL LAW §§ 110, 125) for Mr. Borrelli; And one (1) count of operating a motor vehicle while intoxicated (NEW YORK VEH. & TRAF. § 1192(3)).

83.     Following his arrest, Officer Cronin and/or his attorney have made statements to the effect that at the time of the shooting Officer Cronin was "black-out" drunk and he was re-enacting the HIDTA-2 training in dynamic vehicle takedowns he underwent at Rodman's Neck on April 28 and 29, 2014.

84.     Officer Brendan Cronin pled guilty to two counts of attempted murder in the second degree, two counts of assault in the first degree and one count of driving while intoxicated as a misdemeanor and received a nine year prison sentence.

85.     Sgt. Ching and Officers Griffin, Concannon and Bracconeri were all the subject of Internal Affairs investigations of their actions on April 29, 2014 and all were disciplined for

some but not all of their violations of NYPD policies.

### The City's Longstanding Deliberate Indifference to Alcohol and Substance Abuse By Its Police Officers

86.     The City of New York and the NYPD are responsible for this tragic incident. Although Brendan Cronin pulled the trigger, longstanding policies, procedures and practices of the City and the NYPD proximately caused the injuries to Joseph Felice and his family.

87.     For at least two decades there has been an accepted alcohol culture in the NYPD and a failure, constituting  deliberate indifference, to adopt and/or enforce adequate policies, procedures and practices to address a longstanding problem of alcohol and substance abuse by police officers, both on-duty and off-duty.

88.     The City's and NYPD's deliberate indifference to adequately respond to alcohol and substance abuse by its police officers includes a failure to adopt and/or enforce policies addressing the use and misuse of police issued service weapons by police officers, both on-duty and off-duty, who are not fit for duty because of said abuse while in possession of their firearms.

89.     The City and NYPD knew, or should have known, that there were serious deficiencies in the operation of the NYPD training facility including, but not limited to, a practice of allowing officers to resume training after consuming alcohol during their lunch breaks while officially on-duty.

90.     The City and NYPD knew, or should have known, that there was a failure of the NYPD training facility to evaluate the physical and mental state of officers after they had completed often extremely stressful and rigorous training exercises before returning their service weapons to them and allowing them to depart the facility and abuse alcohol at nearby bars.

91.     Upon information and belief, some of these deficiencies began to be addressed in the aftermath of this incident with an overhaul of the training facility, beginning with the

reassignment of supervisory personnel and the discipline and reassignment of Sgt. Ching. But any such changes were clearly too late to prevent the injuries to Joseph Felice and his family.

### The NYPD's Alcohol Culture & Off-duty Misuse of Force Incidents

92.     It is chilling that, upon information and belief, it has been a common practice for police officers training at Rodman's Neck to drink alcohol during their lunch breaks while on-duty, return to training,  and then be released from training only to continue drinking at nearby City Island bars, sometimes while still officially on-duty.

93.     This means that the NYPD personnel responsible for training and supervising police officers at Rodman's Neck have either failed to detect the tell-tale odor of beer or alcohol on the breathe of police officers returning from lunch, while still in the midst of training, or have turned a blind eye to this behavior, despite it being clearly prohibited by NYPD regulations.

94.     Not only have the Rodman's Neck training and supervisory personnel been deliberately indifferent to alcohol consumption by police officers while they are on-duty and undergoing training, they have returned these police officers' service weapons to them upon dismissal from training with the knowledge that these officers, including Brendan Cronin, had consumed alcohol and/or would soon be consuming alcohol.

95.     The consumption of alcohol by police officers undergoing training at Rodman's Neck, with the knowledge of trainers and supervisors at the facility, has been a longstanding pattern and practice.

96.     Additionally, the Rodman's Neck training and supervisory personnel have been deliberately indifferent to assessing, monitoring and screening police officers at the completion of their training, particularly stressful and rigorous training such as dynamic vehicle takedowns, to determine whether they are leaving the facility mentally and physically fit for duty and should

have their service weapons returned to them.

97.    This incident of a drunken New York City police officer shooting at innocent civilians highlights an open secret within the police force – the NYPD has a longstanding alcohol and substance abuse problem, and the City has been deliberately indifferent to effectively addressing it.

98.    The City's longstanding deliberate indifference is demonstrated by the failure to take necessary steps to deal with the problem despite Commissioner Bratton vowing in 1995, during his first tenure as New York City Police Commissioner, to address it with a "new strategy on police corruption".

99.    Also in 1995, former Mayor Rudolph Guiliani created the Commission to Combat Police Corruption ("Commission") which produced a report in 1998 reviewing cases of on-duty and off-duty misconduct fueled by the misuse of alcohol. The Commission then made recommendations to address the problem but the City and NYPD never took the necessary steps to effectively implement them.

100.    The fact that Officer Cronin and his supervisor Sgt. Ching were drinking together at lunch, while on-duty and participating in a training exercise, demonstrates the pervasive failure of the NYPD to deal with the problem.

101.    It is particularly egregious that Officer Cronin not only consumed alcohol at lunch with his supervisor, Sgt. Ching,  and Officers Bracconeri, Concannon and Griffin while in the midst of training, but that they then continued drinking excessively a few hours later after being released from training and getting their police issued service weapons returned to them.

102.    If Officer Cronin, Sgt. Ching and Officers Bracconeri, Concannon and Griffin were released early from training that day, which as noted is known to be a common practice,

then his on-duty alcohol consumption was even more extensive.

103.    Whether the post-training drinking was technically on-duty or off-duty, Sgt. Ching, and Officer Bracconeri who drank with Officer Cronin at Alehouse post-training, implicitly condoned and encouraged Officer Cronin to consume more than ten alcoholic beverages.

104.    They then did nothing to prevent him from operating his motor vehicle, although knowing he was under the influence *and* in possession of his service weapon.

105.    In so doing, Sgt. Ching and Officer Bracconeri who were drinking with Officer Cronin knew their facilitation of his intoxication and failure to prevent him operating a vehicle actively created and/or increased the danger that innocent civilians - in this case, Mr. Borrelli, Mr. Felice, and their families - were likely to be victims of Officer Cronin's resultant conduct.

106.    Defendant Brendan Cronin's alcohol-fueled misconduct was not an isolated incident as evinced by the number of other incidents, in addition to this incident, involving intoxicated NYPD officers in 2014 alone.

107.    There have been by countless alcohol related arrests involving police officers over the years and a litany of violent acts by police officers misusing force, including deadly force.

108.    In addition to this incident, other incidents involving intoxicated NYPD officers, in 2014 alone, include:

  a.    In January 2014, a NYPD Police Captain found ten beers in the Forty-Seventh Precinct.
  b.    On March 21, 2014, NYPD Police Officer Liam Donahue, 22, slammed his car into an unoccupied car in Bayside, Queens just after 5 a.m. The rookie was charged with DWI.

  c.    On April 7, 2014, NYPD Police Officer Shieed Haniff was charged with four counts related to an incident in which he allegedly crashed into multiple cars and nearly plowed down his fellow police officers while driving drunk.

d.      On April 17, 2014, Jeffrey Balzotti, 30, an NYPD Sergeant, was pulled over at 2:30 a.m. in his 2007 Honda Civic on West 126th Street and charged with driving while intoxicated and reckless driving.

e.      On April 18, 2014, at approximately 4:30 a.m., NYPD Police Officer Jose Vanderpool, 30, was charged with DWI after he got into an accident on 32nd Avenue in the Jackson Heights section of Queens and refused a breathalyzer.

f.      On April 18, 2014, at approximately 5:00 a.m., NYPD Sergeant Donald Stewart, 34, was arrested and charged with DWI after he was pulled over near Fulton Street and Boyland Street in the Bedford-Stuyvesant section of Brooklyn.

g.      On April 23, 2014, NYPD Detective Jay Poggi got drunk and accidently shot his partner in the wrist with a .38 revolver.  Instead of calling an ambulance, Poggi decided to personally drive his wounded partner to the hospital—netting him a DWI after he blew a .113 on a blood alcohol test.  Investigators believe the shooting occurred when the on-duty officers, who had just consumed 11 beers apiece, were firing the gun in the air.

h.      Just three hours after the Cronin shooting on April 29, 2014, outside a strip club in Somerset County, New Jersey, NYPD Sergeant Wanda Anthony, assigned to the 122nd Precinct in Staten Island, fired at least one round at a former boyfriend.   Anthony, who fled in a car, was intoxicated at the time of the shooting.

i.      On June 11, 2014, NYPD Police Officer Eugene Donnelly was accused of breaking into an apartment while drunk and wearing only his underwear, then attacking a woman while on her bed. A police source said Donnelly, "beat the hell out of her." The alleged attack came a day after Donnelly received an award from Mayor de Blasio for arresting a gunman.

j.      On August 12, 2014, NYPD Police Officer Richard E. Christopher, 32, with a reported blood-alcohol content of 0.21, drove the wrong way on the New York State Thruway near Suffern, crashing his car head-on into a Honda CRV driven by James DeVito of Airmont. A BAC above 0.08 is a misdemeanor. Both men were killed in the crash, which occurred just before 7 a.m. on Aug. 12, 2014.

109.      In addition to the 2014 alcohol fueled incidents cited above, there are numerous other examples of alcohol abuse by NYPD officers, and the harms that result. Examples include, but are not limited to:

a.      On October 6, 2013, drunken off-duty NYPD Police Officer Joseph McClean was arrested and charged after hitting a pedestrian in Staten Island.  The pedestrian was killed and the officer was charged with manslaughter.

b.      In August 2013, veteran NYPD Police Officer Ronald Holmes was charged with drunken driving related offenses after driving the wrong way on the Southern State Parkway, in Long island, New York.

c.      In March 2013, Joseph King, a 28-year-old NYPD Police Officer, was charged with DWI, Leaving the Scene of an Accident, and Refusal to Take Breath Test. Police say King had gotten into an accident on the BQE in Queens around 4:30 a.m. on Sunday.  After allegedly fleeing the scene and then being pulled over, he refused to take a breath test.

d.      On March 17, 2013, at 6 a.m., NYPD Police Officer Dennis Munge, 32, was charged with DWI in Jackson Heights, Queens.

e.      On March 18, 2013, at 1:30 a.m., NYPD Detective Washington Mosquera, 37, was charged with DWI in Brooklyn.

f.      On November 16, 2012, NYPD Police Officer Miguel Ocasio, 30, was pulled over and was arrested after he refused to take a breath test, authorities said.  Police charged him with resisting arrest, driving while intoxicated and refusal to take a breath test.

g.      Also on November 16, 2012, NYPD Police Officer Ismile Althaibani, 29, was pulled over at about 3 a.m. and ultimately charged with driving under the influence.

h.      In July 2012, NYPD Police Officer Elvis Garcia, 27, who had been on the job for just a year, was driving his personal vehicle about 5:45 a.m. when he was involved in a two-car crash. He was subsequently charged with driving while intoxicated.

i.      In July 2012, NYPD Police Officer Salisha Alirasul, 34, was arrested for DWI.

j.      In July 2012, NYPD Police Officer Brayan Terrazas, 26, was arrested for DWI.

k.      On February 27, 2012, NYPD Police Officer Christopher Morris, 31, was driving a marked squad car when he lost control and smacked into a light pole in East New York about 4 a.m.  He was charged with driving while intoxicated.

l.      In December 2011, NYPD Police Officer Rafael Casiano, 44, was driving on a Bronx expressway at about 4:30 a.m. Friday when his car smashed into a

center divider. The passenger was another off-duty NYPD Police Officer, Keith Paul, who suffered a head wound and had to be hospitalized.  They were coming home from their Manhattan precinct Christmas Party.

m.      In December 2011, NYPD Police Officer Kleaburgh Carvajal was charged with DWI.

n.      In March 2011, NYPD Police Officer Sergio Gonzalez drove under the influence of alcohol or drugs and crashed into the rear of an NYPD patrol car before finally being handcuffed.

o.      In October 2009, NYPD Detective Kevin Spellman was sentenced to three to nine years in prison for the drunk-driving death of a Bronx grandmother.

p.      In 2009, off-duty NYPD Police Officer Andrew Kelly struck a girl with his car in Brooklyn.  Kelly pleaded guilty to driving drunk, served 90 days in jail and went to rehabilitation.

q.      In 2001, an off-duty NYPD Police Officer who spent up to 12 hours drinking before going to his Brooklyn precinct struck and killed a 24-year-old pregnant woman, her 4-year-old son, and her 16-year-old sister.  Medical staff delivered the woman's baby boy, who died 13 hours later, and NYPD Police Officer Joseph Gray was eventually convicted of four counts of second degree manslaughter.  He was sentenced to 5 to 15 years in prison. The event "mushroomed into scandal" when it was discovered that other officers were drinking with Gray in a topless bar at a nearby precinct parking lot before the incident.

r.      On May 18-20, 1995, NYPD Police Officers, staying at the Hyatt Regency Hotel in Washington, D.C., disrobed, poured beer down the lobby escalator and then slid down it.  Some sprayed fire extinguishers at each other and at other guests, set off false alarms and vandalized the hotel.  Other reports involve armed officers in uniform drinking heavily and firearms being discharged from a hotel.  Officers also allegedly tried to gain entry to women's rooms by posing as Federal agents and harassed female guests.

110.   Defendant City, as a matter of policy and practice, has with deliberate indifference, failed to adequately discipline, train, monitor, treat or otherwise direct police officers, including the Defendant police officers and training facility personnel, with regard to the consumption of alcohol on-duty and off-duty.

111.   Defendant City has also failed to adequately create and/or enforce policies and

procedures that address the NYPD employees' substance abuse, including alcohol consumption, and its causal relationship to the misuse of firearms by on-duty and off-duty police officers. This deliberate indifference was a proximate cause of Defendant Officer Cronin's actions on April 29, 2014.

112.    Defendant New York City, as a matter of policy and practice, has with deliberate indifference, failed to properly investigate the background, beliefs and attitudes of prospective police officers in order to ensure it hires only police officers that respect and honor the constitutional rights of individuals, thereby causing the NYPD, including its Defendants in this case, to engage in the unlawful conduct described above.

113.    Defendant New York City, as a matter of policy and practice, has with deliberate indifference, failed to properly screen police applicants for a history of, or propensity for, substance abuse, including alcohol.

114.    Defendant Alehouse has violated the New York Dram Shop Act, N.Y. Gen. Oblig. Law §11-101, and The Alcoholic Beverage Control Law §65(2), by serving, unlawfully selling, and assisting in procuring liquor to visibly intoxicated persons, Officer Cronin, Sgt. Ching, and Officer Bracconeri thereby causing or contributing to their consequent intoxication and their engagement in subsequent actions that caused devastating physical, emotional and psychological injuries and economic harm to the Plaintiffs.

**The Continuing Injuries Suffered By Plaintiffs**

115.    Brendan Cronin inflicted the following gunshot wounds on Joseph Felice:

- One (1) gunshot wound to the right axilla (The area that lies underneath the glenohumeral joint, at the junction of the upper limb and the thorax)

- Three (3) gunshot wounds to the right posterior chest- one (1) bullet remains in Joe's chest as it was too dangerous at the time of the incident to remove and may need to be removed in the future

21

- One (1) gunshot wound to the right back

- One (1) gunshot wound to the right shoulder

- A bullet travelled down Joe's arm and hand, exiting through the right thumb

- A bullet fragment lodged in his head necessitating removal

- A large twisted bullet lodged in his back necessitating removal

- Multiple bullet fragments throughout Joe's torso

116.    It is plainly obvious that Joseph Felice has suffered severe physical injuries as a result of the number and type of bullet wounds he sustained.

117.    While in the emergency room, the doctors and nurses did an incredible job in saving Joe's life. They were able to remove most of the bullets from his body. But the impact of each bullet remains to this day.

118.    One bullet is still lodged in Joe's chest and is a constant reminder of this horrific incident. Every time Joe rolls over in his sleep, he wakes up in pain because of its presence. The medical alert bracelet that Joe must now wear, warning against him receiving an MRI, frequently invites questions from people Joe meets that require him to relive what happened that terrible night.

119.    Joe's multiple bullet wounds and surgical scars are a painful reminder to him and his family every time he takes off his shirt and his bullet riddled torso is visible.

120.    It was almost three months after Joe was shot and gravely wounded, with the help of ongoing occupational, physical and psychological therapy, before he was able to enter and sit in the back seat of a car. To accomplish even this step forward, he required the assistance of anti-anxiety medication Ativan.

121.   The extensive psychological damage Cronin's gunshots have inflicted on Joseph Felice are less apparent to the naked eye, but no less profound and debilitating than his physical injuries.

122.   Unlike Joe's bullet wounds, his family has equally suffered psychological and emotional injuries from Cronin's gunshots – and share with him diagnoses for PTSD and depression.

123.   It was more than six months before Joe was able to sit in the front seat of the car as a passenger.

124.   He is still unable to sit behind the wheel of a car, let alone even think about the possibility of operating a vehicle.

125.   The catastrophic upheaval this has brought to the Felice family cannot be overstated. Driving was, and is, an integral part of Joe's professional life in sales and his personal life as an active husband, father, and sports enthusiast. The inability to drive has stripped Joe of much of his previous personal and professional independence.

126.   In order to provide her husband and family the assistance and support they need in the aftermath of this traumatic event, Joe's wife Patricia has been forced to put aside her own successful career spanning 25+ years first as a SVP Human Resources for Fortune 500 companies and now as a Strategic Human Resource consultant to the same, and will have difficulty regaining the same earning potential after this substantial lapse of employment.

127.   The family's medical benefits derive from Joe's employment, not Patricia's. Obviously, given the ongoing medical needs of Joe and his family, preserving these benefits through Joe's continued employment has been a major priority.

128.   It was also imperative that Patricia's career be placed on hold as she was

concerned about the additional negative psychological impact on Joe if he was not able to return to work – something he could not have done, and still cannot do, without her vigilant assistance.

129.    Patricia must now drive Joe to his business appointments, waiting in the car as he conducts business, then driving him to the next meeting.

130.    The loss of Joe's ability to drive has profoundly damaged his, and Patricia's, quality of life as well as their joint earning capability.

131.    Notices of Claim pursuant to New York General Municipal Law § 50-e was timely served upon Defendant City on July 1, 2014. More than thirty days have elapsed without the matter being resolved by the City. The Notices of Claim provided detailed information regarding the actions of the City and police personnel involved in the incident underlying the instant action and was sufficient to put the police personnel  and the City on notice of the conduct that they are alleged to have engaged in.

## FEDERAL CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

*(42 U.S.C. Section 1983 for Violations of the Fourth and Fourteenth Amendments)*

132.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

133.    Defendants Brendan Cronin, under color of law and with the indicia of authority of a New York City Police Officer, violated Plaintiff Joseph Felice's due process rights to be free from the unreasonable and unnecessary use of excessive force, unreasonable seizures, and to bodily integrity.

134.    Defendants Sgt. Ching, Officers Bracconeri, Concannon and Griffin  Lt. Brown

and Sgt. Simonetti, under color of law and with the indicia of authority of New York City Police Officers, violated Plaintiff Joseph Felice's due process rights to be free from unreasonable seizure, excessive force and to bodily integrity by encouraging, and failing to intervene to prevent, the actions of Defendant Brendan Cronin knowing that he was unlawfully driving while intoxicated and in possession of his service weapon while unfit for duty.

135.    Each of the Defendants' actions directly and proximately caused Plaintiff Joseph Felice's injuries.

136.    By these acts, omissions and conduct, these individual Defendants have deprived the Plaintiffs of rights secured by the Fourth and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. Section 1983, for which the Defendants are individually liable.

## SECOND CLAIM FOR RELIEF

*(Monell Claims For Municipal Liability Against Defendant New York City)*

137.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

138.    Defendant City knew of the longstanding problem of alcohol and substance abuse and its causative relationship to on-duty and off-duty violent acts by police officers. In fact, Comm. Bratton acknowledged this problem while serving his last tenure as NYPD Commissioner from 1994-1996.

139.    Said Defendants knew or should have known that the failure to adequately address alcohol and substance abuse within the department had caused problems in the past, and would continue to cause problems in the future, including violations of constitutional rights because of the failure to adopt and implement adequate policies, procedures and practices and to

adequately screen, train, supervise and/or discipline police officers engaging in, or likely to engage in, such behavior.

140.    This deliberate indifference on the part of the City directly and proximately caused the deprivation of Plaintiff Joseph Felice's constitutional rights secured by the Fourth and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. §1983.

## THIRD CLAIM FOR RELIEF

### *(Supervisory Liability)*

141.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

142.    Sgt. Ching, at all relevant times Defendant Officer Cronin's and Defendants Officers Bracconeri, Concannon and Griffin's superior, directly and personally participated in acts that were the proximate cause of Plaintiffs' injuries.

143.    Defendant Sgt. Ching knowingly, and with a grossly negligent derogation of his duty, encouraged and facilitated Officer Cronin and the other officers under his supervision to drink excessively while both on-duty and off-duty.

144.    Defendants Lt. Brown and Sgt. Simonetti, knowingly and with a grossly negligent derogation of their duty, encouraged and facilitated Officer Cronin and the other officers under their supervision on April 29, 2014 to drink alcohol while on-duty and off-duty and to resume control of their service weapons without determining their fitness for duty.

145.    Defendants Sgt. Ching, Lt. Brown and Sgt. Simonetti knowingly, and with a grossly negligent derogation of his duty, encouraged and facilitated Officer Cronin to drive his car while intoxicated and in possession of his service weapon while unfit for duty.

146.    As a direct and proximate cause of Defendant Sgt. Ching's, Lt. Brown's and Sgt.

Simonetti's failure to supervise their subordinates, particularly Officer Cronin, Plaintiffs' constitutional rights were violated as aforementioned in violation of 42 U.S.C. § 1983.

147.     As a direct and proximate result of the aforementioned actions and/or inactions of said Defendants, Plaintiffs' constitutional rights under the Fourth and Fourteenth Amendments were violated.

## STATE LAW CLAIMS FOR RELIEF

## FOURTH CLAIM FOR RELIEF

*(Respondeat Superior Liability Against Defendant New York City)*

148.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

149.     At all times pertinent hereto, Defendants Officer Cronin, Sgt. Ching, Officers Bracconeri, Concannon and Griffin, Lt. Brown and Sgt. Simonetti were acting within the scope of their employment as officers of the NYPD.  Defendant City, through its agents, expressly authorized the individual Defendants Officer Cronin, Sgt. Ching, Officers Bracconeri, Concannon and Griffin, Lt. Brown and Sgt. Simonetti to violate Plaintiff's constitutional rights, as described above.

150.     Defendant City knew, through its agents and through the NYPD's derogation of duty, that Defendants Brendan Cronin, Sgt. Ching, Officers Bracconeri, Concannon and Griffin, Lt. Brown and Sgt. Simonetti had a propensity for committing such illegal acts in the line of duty, and acquiesced in the Defendants' wrongful conduct.

151.     Defendant City is thus liable under the doctrine of respondeat superior, for the intentional and negligent torts of Defendants Officer Cronin, Sgt. Ching, Officers Bracconeri, Concannon and Griffin, Lt. Brown and Sgt. Simonetti which were committed within the scope of

their employment.

## FIFTH CLAIM FOR RELIEF

### *(Negligence)*

152.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

153.    Defendants Officer Cronin, Sgt. Ching, Officers Bracconeri, Concannon and Griffin, Lt. Brown and Sgt. Simonetti while acting as employees for New York City, owed a duty to Plaintiffs to perform their duties without violating Plaintiff's constitutional rights.

154.    Defendants Officer Cronin, Sgt. Ching and Officers Bracconeri, Concannon and Griffin  abused alcohol both on-duty and off-duty, violated their 24 hours a day duty to enforce and adhere to the laws governing driving while intoxicated, and possessed (and in regard to Officer Cronin used) firearms while unfit for duty. These violations were proximate causes of the unlawful and unnecessary use of force against Plaintiff Joseph Felice, and constitutes negligence for which these Defendants are liable.

## SIXTH CLAIM FOR RELIEF

### *(For Assault and Battery Against Defendant Cronin)*

155.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

156.    The actions of Defendant Officer Cronin were intentional, malicious, and were committed with wanton disregard and with depraved indifference for the Plaintiff's rights.

157.    The actions of said Defendant constituted unwarranted, unreasonable, unnecessary and excessive use of force against Plaintiff Joseph Felice who was simply an unsuspecting civilian returning home to his family after playing hockey.

158.    The actions aforesaid constituted unlawful assaults and batteries upon Joseph Felice.

159.    As a result of the conduct alleged herein by said Defendants, Joseph Felice suffered, and continues to suffer, severe physical, psychological, emotional and economic injuries.

## SEVENTH CLAIM FOR RELIEF

### (*Loss of Consortium and Services for Patricia Sclafani*)

160.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

161.    At the time of the incident complained of, Plaintiffs Joseph Felice and Patricia Sclafani were married and continue to be married.

162.    As a result of the wrongful acts of the Defendants, Plaintiff Patricia Sclafani was caused to suffer, and will continue to suffer in the future, loss of consortium, loss of society, affection, assistance, and conjugal fellowship, all to the detriment of their marital relationship.

163.    Plaintiff Patricia Sclafani's entire life has been and continues to be dramatically changed as a result of the Defendants' actions.

164.    The effective balance she had previously worked so hard to achieve between having a very successful career and an active and fulfilling role as a wife and mother was and continues to be completely derailed as of April 29, 2014.

165.    Patricia must now devote herself 24 hours a day, 365 days a year towards efforts to make her family functional.

166.    She performs services for her family well beyond those expected of a wife and mother, including, but not limited to, extensive wound care and other medical assistance to Joe

as needed since he was shot, as well as continuing to devote much of her time to providing her husband daily transportation he needs to be able to work and maintain his active sales position.

167.    These responsibilities, and the trauma of the events caused by the Defendants' wrongful and willful acts, continue to inflict upon Patricia and her family severe physical, psychological, emotional and economic injuries.

## EIGHTH CLAIM FOR RELIEF

*(Against Alehouse for Violation of the New York Dram Shop Act*
*and The Alcoholic Beverage Control Law §65(2))*

168.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

169.    The Defendant Alehouse violated the New York Dram Shop Act, N.Y. GEN. OBLIG. Law §11-101, and The Alcoholic Beverage Control Law §65(2), by serving, unlawfully selling, and assisting in procuring liquor to visibly intoxicated persons, Officer Cronin, Sgt. Ching, and Officer Bracconeri.

170.    Said violation caused or contributed to the consequent intoxication of Defendants Officer Cronin, Sgt. Ching, and Officer Bracconeri, and their engagement in subsequent actions that were the proximate cause of Plaintiffs' severe physical, psychological, emotional and economic injuries for which defendant Alehouse is responsible.

## NINTH CLAIM FOR RELIEF

*(Against Alehouse for Negligence)*

171.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

172.    Defendant Alehouse through its actions in serving defendants Officer Brendan Cronin, Sgt. Edwin Ching, and Officers Bracconeri, Concannon and Griffin, negligently

conducted its business.

173.    As a result, Plaintiffs suffered and continue to suffer severe physical, psychological, emotional and economic injuries for which defendant Alehouse is responsible.

## PUNITIVE DAMAGES

174.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

175.    The acts of the individual Defendants were willful, wanton, malicious and oppressive. These acts were without any justification and caused Plaintiffs severe and ongoing suffering. Such acts therefore warrant an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

a.    Compensatory damages in an amount to be determined at trial;

b.    Punitive damages in an amount to be determined at trial;

c.    An award of the costs and expenses of this action including attorneys' fees to the Plaintiffs pursuant to 43 U.S.C. §1988; and

d.    Any such other and further relief as this Court may deem appropriate.

## A JURY TRIAL IS DEMANDED

DATED:     New York, New York
           July 15, 2016

                              **NEWMAN FERRARA LLP**

                              By: _____
                                  Debra S. Cohen
                                  dcohen@nfllp.com
                                  Randolph M. McLaughlin
                                  rmclaughlin@nfllp.com
                                  1250 Broadway, 27th Floor
                                  New York, New York 10001
                                  Tel: 212-619-5400
                                  Fax: 212-619-3090

                                  STOLZENBERG CORTELLI LLP
                                  Howard B. Stolzenberg, Esq.
                                  hstolzenberg@stolzcortlaw.com
                                  Terrence J. Cortelli, Esq.
                                  tcortelli@stolzcortlaw.com
                                  305 Old Tarrytown Road
                                  White Plains, NY 10603
                                  Tel: 914-361-4888